1

2

3

4

5

6                          UNITED STATES DISTRICT COURT

7                               DISTRICT OF NEVADA

8                                      * * *

9   TRUSTEES of the NORTHERN NEVADA      )
    OPERATING ENGINEERS HEALTH AND       )
10  WELFARE TRUST FUND, et al.,          )            3:08-CV-00578-LRH-RAM
                                         )
11              Plaintiffs,              )
                                         )
12  v.                                   )
                                         )
13  MACH 4 CONSTRUCTION, LLC, et al.,    )
                                         )
14              Defendants.              )
    _____)
15                                       )
    MACH 4 CONSTRUCTION, LLC.,           )
16                                       )            3:09-CV-00565-LRH-RAM
                Plaintiff,               )
17                                       )
    vs.                                  )            <u>OPINION</u>
18                                       )
    OPERATING ENGINEERS LOCAL #3,        )
19                                       )
                Defendant.               )
20  _____)

21          This is a suit for an employer's delinquent fringe benefit contributions under the Employee

22  Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1002 *et seq*. Plaintiffs Trustees of

23  the Northern Nevada Operating Engineers Health and Welfare Trust Fund ("Trustees") are the

24  chairman and co-chairman of five trust funds run for the benefit of unionized operating engineers

25  (the operators of heavy construction machinery, like bulldozers). These trust funds are employee

26  benefit plans and multi-employer plans under Section 3 of ERISA, 29 U.S.C. §§ 1002(3), (37).

Counterclaim plaintiff Operating Engineers Local 3 ("Local 3") is a union representing operating engineers in Nevada. Defendant and counterclaim defendant Mach 4 Construction, LLC ("Mach 4") is a Nevada construction company that employs operating engineers. Defendants Duncan and Angela Miller own and operate Mach 4.

Trustees and Local 3 allege that Mach 4 and the Millers breached their obligation to pay fringe benefits under agreements executed with Local 3. Mach 4 and the Millers respond that, after a one-year trial period with the union, these agreements ended, consequently terminating Mach 4's obligation to pay fringe benefits beyond the one-year period.

After relating the procedural history of this consolidated action and summarizing the trial proceedings, the court makes its findings of facts and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a). The court determines that the agreements between Local 3 and Mach 4 terminated on June 30, 2008. Therefore, Trustees and Local 3 may only recover delinquent contributions that accrued up to June 30, 2008.

**I.    Procedural History**

In this case, two actions were consolidated for the purposes of a bench trial. (Order #69.[1]) In the base case (3:08-CV-00578), Trustees sued Mach 4 and the Millers for delinquent fringe benefit contributions due under Mach 4's agreements with Local 3 (and under Sections 502 and 515 of ERISA, 29 U.S.C. §§ 1132, 1145). (Complaint #1.) Trustees pleaded four causes of action: (1) to compel payment of unpaid contributions, (2) to compel filing of accurate monthly contribution reports, (3) to compel Mach 4's submission to an audit, and (4) to establish guarantor liability of the Millers for the unpaid contributions. (*Id*.) On July 7, 2009, the court approved an audit of Mach 4. (Order #40.) Following the audit, however, the court denied Trustees' motion for summary judgment on the grounds that there was a genuine issue of material fact as to the termination of the agreements with Local 3. (Order #59, p. 6:8-11.)

---

[1] Refers to the court's docket entry number in the -578 action unless otherwise noted.

Mach 4 and the Millers initially counterclaimed against third-party Local 3 in the Trustees' action, but they later voluntarily dismissed these counterclaims and re-filed them against the union in a separate case. (Order #69, p. 1:20-21.) In that case (3:09-CV-00565), Mach 4 brought four claims for relief against Local 3, each of which was based on Mach 4's argument that it had effectively terminated its contractual relationship with the union. (Complaint #1.[2]) Local 3 brought two counterclaims (a breach of contract claim and a declaratory judgment claim) based on the premise that Mach 4 had failed to effectively terminate this relationship. (Amended Answer #16.[3]) Following Local 3's motion for partial summary judgment on Mach 4's claims, the court found that the agreements with the union were "clear and unambiguous with respect to Mach 4's termination rights and obligations" and granted judgment against Mach 4 on all of its claims. (Order #33, p. 6:5-6.[4]) The court specifically found that "Mach 4 failed to effectively terminate its contractual relationships with [Local 3]." (*Id.* at p. 8:23-24.) Local 3's counterclaims proceeded to trial. (*Id.* at p. 9:7-8.) The court also noted its inconsistent holding in the Trustees' action, explaining that "in the base case, neither of the parties identified or briefed" the relevant termination provisions. (*Id.* at p. 8:14-15.)

In light of the court's more informed view of these termination provisions, Trustees renewed their motion for summary judgment. (#115.) However, the court denied this motion, finding "disputed issues of material fact relating to the audit report." (Order #128, p. 3:7-8.)

Thus, Trustees proceeded to trial on all of their claims, and Local 3 proceeded to trial on their counterclaims. Mach 4 began trial, for all relevant purposes, as a defendant facing two plaintiffs.[5]

---

[2] Refers to the court's docket entry number in the -565 action.

[3] Refers to the court's docket entry number in the -565 action.

[4] Refers to the court's docket entry number in the -565 action.

[5] The Millers themselves were only named defendants in the Trustees' action.

3

At trial, Local 3 introduced–for the first time–evidence that threw significant doubt on the court's earlier interpretation of the termination provisions. In particular, this evidence supported Mach 4's claim that it had effectively terminated the agreements with Local 3. In light of this evidence, the court reversed its previous ruling that the agreements were "clear and unambiguous with respect to Mach 4's termination rights and obligations." (Trial Transcript ("Tr."), pp. 763-64.) The court also ordered each party to submit post-trial briefing reckoning with the newly introduced evidence. The parties submitted opening, response, and reply briefs. (## 99, 102, 105[6] (Local 3); ## 148, 151, 154 (Trustees); ## 147/91, 149/101, 152/103 (Mach 4).[7])

## II.   Trial Proceedings

Following significant discovery, (*see, e.g.*, Chronology of Discovery Requests #139), the Trustees' action and Local 3's action were consolidated for trial. (Order #69.) While the court found that these actions shared common questions of law and fact, (*id*. at p. 2:10-14), Trustees and Local 3 presented their cases separately. The court here summarizes relevant testimony.

### A.  Background

Angela and Duncan Miller testified to the relevant factual background. The Millers both graduated from high school in the Elko, Nevada area, getting married shortly afterward. (Tr. at pp. 640:8-21; 715-16.) Neither of the Millers had formal education beyond high school. (*Id*.) Duncan Miller had worked as an operating engineer in and around Elko since graduation, working his way up from laborer to project superintendent. (*Id*. at pp. 716, 726-27.) During this period, Duncan[8] was a member of Local 3, as had been his father and his grandfather. (*Id*. at 726:5-18.)

---

[6] Each number in this sequence refers to the court's docket entry number in the -565 action.

[7] Mach 4 submitted opening, response, and reply briefs in each action. The number following the backslash refers to the court's docket entry number in the -565 action.

[8] There are three Millers who testified at trial: the married couple Angela and Duncan Miller, and Trustees' witness Alex Miller. Intending no disrespect, the court refers to the relevant Miller by his or her first name in order to avoid confusion.

Ultimately, Duncan started his own construction business, High Mark Construction, with a partner. (Tr. at p. 728:18-19.) Angela worked as a secretary for High Mark during the duration of Duncan's involvement, about nine years. (*Id*. at p. 655-56.) During that time, High Mark had one single-project contract with Local 3. (*Id*. at p. 729:2-6.)

Duncan and Angela left High Mark to start Mach 4 in March 2007. (Tr. at pp. 622:1-7; 715:15-18.) Duncan and Angela testified that they brought some High Mark employees with them when they started Mach 4, but Mach 4 was still in need of trained operators. (*Id*. at p. 722:15-21.) The Millers were therefore receptive when Local 3 approached them. (*Id*. at p. 631:6-10.)

**B. The Agreements**

At the heart of this dispute are five agreements. Four of these agreements are between Mach 4 and Local 3, and one agreement is between Local 3 and a multi-employer group, the Associated General Contractors of America (to which Mach 4 does not belong). First, the latter agreement–entitled the Master Agreement–sets the going rates for wages, fringe benefit contributions, and a host of other labor provisions. (Trial Exhibit ("Ex.") 2.) Second, the Independent Northern Nevada Construction Agreement ("Short Form Agreement") is an agreement executed between employers who are not members of the Associated General Contractors of America and Local 3. (Tr. at p. 285:23-24.) This agreement incorporates most provisions of the Master Agreement by reference. (Ex. 1, p. 328, § 2.) Third, the Northern Nevada Mining and Stripping Agreement ("Mine Strip Agreement") sets out separate wage rates, fringe benefit contributions, and work conditions for work relating to mine construction. (Ex. 13.) Fourth, the Northern Five Counties Agreement ("Five County Agreement") sets out separate wage rates and fringe benefit contributions for work not covered by the other agreements. (Ex. 14.) The Short Form, Mine Strip, and Five County Agreements are signed by the Millers and union officials and dated May 1, 2007. (Ex. 1 at p. 328; Ex. 13, p. 8; Ex. 14, p. 2.)

Fifth, the Organizing Agreement memorializes employer-requested terms that differ from those in the Master Agreement or in any of the other agreements. (Tr. at p. 285:7-10.) There are

two Organizing Agreements at issue in this case, a two-page Organizing Agreement and a one-page Organizing Agreement. Both agreements provide that "[t]his Organizing Agreement establishes the terms and conditions upon which the Employer shall become signatory." (Ex. 1, p. 330 (two-page); Ex. 22 (one-page).) Both agreements provide that Mach 4 shall have six months starting May 1, 2007, to assemble its own crew of workers. (*Id*.) And both agreements provide that "[t]he Employer has executed the Union's Independent Northern Nevada Construction Agreement." (*Id*.)

However, the two-page agreement includes a $500 employee-paid initiation fee, while the one-page agreement does not mention an initiation fee. (*Compare* Ex. 1 at p. 330 *with* Ex. 22.). The two-page agreement also states that "[t]he Employer agrees to the terms and conditions of the Master Agreement, except as specifically modified by this Organizing Agreement." (Ex. 1 at p. 330.) The one-page agreement does not contain this language. (Ex. 22.) Most importantly, the two-page agreement provides that it shall automatically renew for the duration of any subsequent Master Agreement "unless either party gives written notice not less than sixty (60) nor more than ninety (90) days before the expiration date of any such Master Agreement." (Ex. 1 at p. 331.) In contrast, the one-page agreement provides that it "shall remain in effect until May 1, 2008." (Ex. 22.)

The two-page agreement contains signatures of both the Millers and union officials, but the one-page agreement contains only the signatures of the Millers. (Ex. 1 at p. 331; Ex. 22.) The two-page agreement is dated May 1, 2007, but Angela and Duncan Miller have written "5-17-07" next to each of their signatures. (Ex. 1 at p. 331.) The one-page agreement is also dated May 1, 2007, and Angela and Duncan Miller have written "5-1-07" next to each of their signatures. (Ex. 22.) Finally, the two-page agreement appears to have a file stamp in the bottom left-hand corner of the first page reading "May 15, 2007-sac / Nevada Organizing Agreement." (Ex. 1 at p. 330.)

**C. Allen Strong's Testimony: Signing the Agreements**

Allen Strong, Local 3's organizer in Elko, testified with the aid of a business diary that had been prepared a week prior to trial. (Tr. at p. 525-26.) Strong approached the Millers to discuss an agreement with the union. (*Id*. at p. 625:1-9.) Strong testified on direct examination by Mach 4's

counsel that meetings with Mach 4 began April 18, 2007. (*Id*. at pp. 485-86.) At this first meeting, Strong introduced himself to Duncan, but the meeting did not involve substantive discussion. (*Id*. at pp. 488-89.) Strong testified that subsequent meetings with Mach 4 occurred on April 25 and April 27. (*Id*. at pp. 489:16-19; 493:1-7.) At the April 25 meeting, Strong met with Duncan and Angela. (*Id*. at p. 489:20-21.) Strong brought along copies of three separate agreements (the Master Agreement, the Mine Strip Agreement, and the Five County Agreement) and went over wage rates and other issues. (*Id*. at p. 490:1-7.) Strong did not discuss the termination provisions of the agreements at that meeting. (*Id*. at p. 490:8-9.) At the April 27 meeting, Strong answered Duncan and Angela's questions about the agreements. (*Id*. at p. 493:17-23.) They discussed termination dates, but Strong testified that they did not discuss a one-year agreement. (*Id*. at p. 494:6-7.)

After the April 27 meeting, however, Strong testified that he "found out there was an agreement out there, what was called an Organizing Agreement, and it was for a one-year agreement." (Tr. at pp. 496-97.) Strong recalled Angela's aversion to a long-term agreement, but he testified that he was unsuccessful in locating the one-year Organizing Agreement. (*Id*. at pp. 497:18-19; 502:10-14)

Strong further testified on direct examination that the Millers signed the Short Form, Mine Strip, and Five County Agreements on May 11, 2007. (Tr. at p. 498:1-4.) Strong testified that the Millers did not sign the one-year Organizing Agreement on May 11. (*Id*. at pp. 500-01.) The agreements were backdated to May 1, 2007, because Angela was concerned about her employees receiving insurance retroactively. (*Id*. at p. 498:5-12.) Strong testified that the agreements did not contain the union representatives' signatures at the time the Millers signed them. (*See id*. at pp. 503:12-17; 505:17-22; 506:6-9.) The union representatives signed the agreements later, after they were mailed to the union offices in Reno. (*Id*. at p. 524:11-15.)

Strong then testified to two further meetings at Mach 4, one on May 14 and one on May 16. (*Id*. at pp. 511:6-11; 519:6-12.) On May 14, Strong had several Mach 4 employees sign "Supplemental Dues Authorization Cards" and membership applications for the union. (Exs. 23-

25.) The May 16 meeting involved Duncan, some Mach 4 employees, and two other union

representatives, Steve Ingersoll and Rod Young. (*Id*. at p. 519:10-12.) As best as Strong could

recall, the purpose of that meeting was to go over union hiring procedures. (*Id*. at p. 519:17-18.)

On cross-examination by Local 3's counsel, however, Strong's testimony changed. Using

Strong to lay its foundation, Local 3 introduced Exhibit 22–the one-year Organizing Agreement.

Strong testified that this agreement was, in fact, signed on May 11. (Tr. at pp. 535-537.) He further

testified that the two-page Organizing Agreement was signed on May 17 at a meeting at which he

was present. (*Id*. at pp. 534-35.) Strong explained that the one-page Organizing Agreement was

"the wrong one" because it did not include the $500 employee initiation fee. (*Id*. at p. 537:22-24.)

As a result, Strong had the Millers sign the two-page Organizing Agreement–which includes the

initiation fee–on May 17. (*Id*. at p. 538:19-23.) Strong also testified that he outlined the sixty-ninety

day termination provision at that meeting. (*Id*. at p. 539: 7-11.)

**D.  Other Testimony: Signing the Agreements**

Steve Ingersoll, the District Representative for Local 3, testified that a union officer

approved a one-year agreement with Mach 4, though Ingersoll did not see the one-page Organizing

Agreement until shortly before trial. (Tr. at pp. 567:1-7; 569:2-4.) Ingersoll also testified that he

attended a short meeting in December 2007 with the Millers to renew the Mine Strip Agreement.

(*Id*. at pp. 266:23-25; 571-72.) Ingersoll recalled that this meeting ended without reaching a

renewal agreement. (*Id*. at pp. 571-72.)

Lisa Reed, Mach 4 and the Millers' accountant, testified that she attended two meetings in

May 2007 at Mach 4's premises. (Tr. at pp. 393-94.) The first involved discussions with two union

representatives, Ingersoll and Strong, about pay codes and pay scales. (*Id*. at pp. 393:14-16; 399-

400.) Reed testified that the second meeting occurred on May 18 "to go over the possible signing of

the contract." (*Id*. at pp. 394-95.) Reed testified that attendees at this meeting included the Millers,

Mach 4 employees, and Steve Ingersoll and Allen Strong. (*Id*. at p. 395:10-13.) Reed further

testified that, at the May 18 meeting, Ingersoll said he had been given authority to offer a one-year

8

contract, and that the contract the Millers signed at the May 18 meeting was a one-year contract. (*Id*. at p. 397:3-11.) She saw the Millers sign "three or four pieces of paper." (*Id*. at p. 397:14-17.) She testified that one document had been dated May 17, but that Ingersoll instructed that the remaining documents had to be dated May 1. (*Id*. at pp. 397-98.) Reed understood a one-year agreement to have been put in place. (*Id*. at p. 405:6-9.) She testified that the spaces on the agreements for the union representatives' signatures were blank. (*Id*. at pp. 416-17.)

Kristen Bauer, Mach 4's bookkeeper, testified that she attended two meetings involving Mach 4 and the union, one on May 14 and one on May 17 or 18. (Tr. at pp. 590:5-7; 593:3-8; 609:13-22.) She testified that Ingersoll and Strong were present at both the earlier meeting and the later meeting. (*Id*. at pp. 590:9-12; 593:19-22.) At the earlier meeting, Bauer testified that Strong indicated the contract would be "a one-year trial." (*Id*. at p. 591:12-14.) Bauer did not understand there to be a contract with the union in place at the time of the earlier meeting. (*Id*. at p. 604:2-9.) At the later meeting, Bauer testified that Strong and Ingersoll confirmed the one-year trial period. (*Id*. at p. 593-94.) She also testified that the Millers signed "four or five" sheets of paper at the later meeting. (*Id*. at p. 594:3-10.) Bauer testified that Strong did not discuss the sixty-ninety day termination window at the later meeting. (*Id*. at p. 594:18-20.)

Brooks Morrow, a Mach 4 project manager, testified that he was present during a meeting at which the Millers signed the union contracts. (Tr. at pp. 418:19-20; 419-20.) Morrow testified that Ingersoll and Strong were also present. (*Id*. at p. 420:2-15.) Morrow recalled discussion of a one-year contract. (*Id*. at p. 421:12-18.) Similarly, Paul Fogle, a Mach 4 superintendent, testified that he attended a May 2007 meeting involving Strong at which a "one-year trial basis" was discussed. (*Id*. at pp. 435-36.)

Angela and Duncan Miller testified largely to the same set of facts. Angela testified that Strong introduced himself to the Millers sometime in April, and that they discussed a "one-year trial basis" at a later April meeting. (Tr. at p. 625:1-11.) The next meeting occurred in May, this time involving Mach 4 employees. (*Id*. at p. 625-26.) Finally, the Millers met with Strong on May

17 to sign the agreements. (*Id*. at p. 626:12-13.) The Millers signed all of the agreements that day. (*Id*. at p. 628:15-16.) Angela testified that she signed the two-page Organizing Agreement but objected to the termination provision. (*Id*. at p. 627:13-19.) She wanted a termination provision that clarified the one-year trial basis. (*Id*.) Angela testified that Strong did not discuss the sixty-ninety day termination window at the May 17 meeting. (*Id*. at p. 628:2-5.)

In response to Angela's concerns, Strong said "he would bring a contract back later that clarified it." (Tr. at p. 627:22-23.) Angela testified that Strong brought the one-page Organizing Agreement back to the Millers later that same day (several hours later, according to Duncan), at which point the Millers signed it. (*Id*. at pp. 629-30; 752-53.) This was the last time the Millers saw the one-page Organizing Agreement. (*Id*. at p. 629:18-24.) However, in late June they received copies of the Short Form, Mine Strip, Five County and (two-page) Organizing Agreements that had been signed by the union. (*Id*. at p. 697:13-24.)

**E.  May 2007 to June 2008**

The Millers testified that they were unhappy with the quality of equipment operators being dispatched by Local 3's hiring hall. (Tr. at p. 631:11-21.) These concerns caused Mach 4 to convene a meeting in December 2007 with union representatives, including Ingersoll. (*Id*. at pp. 384:18-22 (testimony of Robert Wines, the Millers' attorney); 633:4-16 (testimony of Angela Miller); 571-72 (testimony of Steve Ingersoll).) At this meeting, the Millers discussed terminating their agreements with Local 3. (*Id*. at pp. 634:5-9 (testimony of Angela Miller); 724-25 (testimony of Duncan Miller).) However, the meeting did not resolve the Millers' concerns. (*Id*. at pp. 571-72 (testimony of Steve Ingersoll); 635:4-9 (testimony of Angela Miller).)

Strong testified to a March 2008 meeting in which Duncan told him that "he didn't think they [Mach 4] were going to sign [with the union] again." (Tr. at p. 522:6-7.) Ingersoll testified to a late May 2008 conversation with Angela regarding the termination of Mach 4's contract with Local 3. (*Id*. at p. 573:11-21.)

///

Both Trustees' witnesses and Mach 4's witnesses testified that the Millers made the required fringe benefit contributions during the period from May 2007 to June 2008. (Tr. at pp. 605:10-19 (testimony of Kristen Bauer); 637:16-19 (testimony of Angela Miller); 328:1:14 (testimony of Steve Ingersoll); 179:2-6 (testimony of Trustees' witness Alex Miller); Ex. 12, pp. 161-327 (employer contribution reports from May 2007 to June 2008).)

**F.  June 2008 and Afterwards**

In Angela Miller's late May 2008 conversation with Ingersoll regarding termination, Ingersoll told Angela to "send it to me in writing" or "put it in writing." (Tr. at pp. 573:18-21 (testimony of Steve Ingersoll); 635:13-18 (testimony of Angela Miller).) Angela sent a letter to Ingersoll dated June 2, 2008 in which she wrote, "As of May 1, 2008, all of our contracts with the Union are terminated. . . . We do not wish to re[-]sign." (Ex. 501.) Ingersoll responded that Mach 4 was "out of the timelines to request such termination," meaning the sixty-ninety day window prior to the expiration of the Master Agreement. (Ex. 502.) On June 13, 2008, the Millers replied that "our last binding contract with you will be expired on June 30, 2008," referring to the Master Agreement's June 30 expiration date. (Ex. 503; Tr. at p. 694:9-18 (testimony of Angela Miller).) The final correspondence between Local 3 and Mach 4 took place in the form of a letter from Local 3's "Associate House Counsel" Jolsna M. John, in which John told the Millers that "the notice of termination period under your contract ran from April 2, 2008—May 2, 2008." (Ex. 504.) Therefore, John concluded, the Millers' June 2 termination letter was untimely and ineffective. (*Id*.) Nevertheless, Mach 4 stopped paying fringe benefit contributions beginning July 1, 2008. (Tr. at pp. 605:10-19 (testimony of Kristen Bauer); 637:16-19 (testimony of Angela Miller); 328:1:14 (testimony of Steve Ingersoll); Ex. 12, pp. 133-61 (employer contribution reports beginning July 2008).)

**G.  The Audit**

Trustees' expert witness Alex Miller, testified to the results of the compelled audit. (Order #40.) Trustees engaged the firm Hemming Morse to perform Mach 4's audit, and Alex Miller is

11

Hemming Morse's Senior Vice President in charge of the audit department, a position he has held for over fourteen years. (Tr. at pp. 82:9-24; 91:11-13.) Alex is responsible for reviewing audit reports, and he conducted such a review for the Mach 4 audit. (*Id.* at p. 92:1-3.)

Alex testified that, for an audit period beginning May 2007 and ending when the audit occurred (in September 2009), Mach 4 owed fringe benefit contributions and liquidated damages totaling $198,947.75. (Ex. 4, p. 1.) Alex testified that the auditors arrived at this amount using the same contribution rates employed by Mach 4 in submitting its own contribution reports. (Tr. at pp. 206-17; 245:19-22.) However, liquidated damages were calculated at 15% of the unreported contributions instead of the required 12%. (*Id.* at p. 105:6-16.) For the May 2007 to June 2008 period, Alex characterized the level of underreporting as "not unusual." (*Id.* at p. 179:2-6.)

## III.   Credibility Determinations

### A.  Trustees' Witnesses

Trustees called Steve Ingersoll and Alex Miller as witnesses.[9] Mach 4 did not challenge Ingersoll, nor did Mach 4 challenge the qualifications of Alex Miller. However, Mach 4 did object, both before and during trial, to the reliability of Alex's testimony. The court overruled both objections. (Order #58; Tr. at pp. 96-97.)

Having observed and considered the testimony presented, the court concludes that Alex Miller provided credible opinion testimony. The court further concludes that Ingersoll's testimony relating to the Trustees' case (namely, the description of the different types of agreements and the description of the Millers' attempt to cancel the agreements) was credible.

### B.  Local 3's Witnesses

Local 3 called Steve Ingersoll and Steve Bentivoglio. Steve Bentivoglio was excluded because he was proffered to testify to Local 3's damages, but Local 3 did not disclose any damages prior to trial despite Mach 4's interrogatories seeking such disclosures. (Tr. at p. 379:3-7.)

---

[9] Trustees also called Angela Miller to testify to the personal guaranty portion of the agreements. The court finds Angela's testimony on this subject credible.

Testifying for Local 3, Ingersoll was credible except for the events surrounding the signing of the agreements and the December meeting. Numerous witnesses placed Ingersoll at the signing of the contracts with Mach 4. (Tr. at pp. 395-97 (testimony of Lisa Reed); 420:1-6 (testimony of Brooks Morrow); 593:19-22 (testimony of Kristen Bauer).) However, Ingersoll himself testified that the first time he saw the two-page Organizing Agreement was "after [it] was signed by the Millers." (*Id*. at p. 568:6-9.) Furthermore, Ingersoll testified that he did not recall discussing termination of the agreements with the Millers during the December 2007 meeting. Yet the Millers' attorney, Robert Wines, and the Millers themselves testified that termination was discussed at that meeting. (*Id*. at pp. 387:10-13 (testimony of Robert Wines); 634:5-9 (testimony of Angela Miller); 724-25 (testimony of Duncan Miller).) Accordingly, the court gives little weight to Ingersoll's testimony surrounding the May signing and the December meeting.

**C. Mach 4's Witnesses**

Mach 4 called Allen Strong, Robert Wines, Lisa Reed, Kristen Bauer, Brooks Morrow, Paul Fogle, Jacob Kendall, Steve Ingersoll, Angela Miller, and Duncan Miller.[10]

The court finds that Strong is not credible with respect to the events surrounding the signing of the agreements. First, Strong contradicted himself during his testimony. He testified that he was unable to locate a one-year Organizing Agreement, but after Local 3's counsel produced such an agreement, Strong testified that he had the Millers sign it on May 11, 2007. (Tr. at pp. 502:10-13 ("Q: You mentioned that you'd found an Organizing Agreement with a one year. . . . A: I did not find it."); 535:15-51 ("Q: Mr. Strong . . . [d]o you recognize that document [the one-year Organizing Agreement]? A: I do.").) Second, though numerous witnesses testified that the Millers signed all the agreements on May 17 or 18, Strong testified that the Millers signed the agreements on May 11. (*Id*. at p. 496:10-20.) This inaccuracy is more troubling because Strong was able to

---

[10] Though Lisa Reed was disclosed as a potential expert witness, she testified only in a lay capacity. Furthermore, Jacob Kendall's testimony as to Local 3's hiring hall practices is irrelevant to the court's decision.

refresh his recollection with his business diary.[11] (*Id*. at p. 520:13-16.) This inaccuracy is also an inconsistency: Strong testified that the Millers signed the two-page Organizing Agreement on both May 11 and May 17. (*Id*. at pp. 500-01 ("Q: Was that [the two-page agreement] the Organizing Agreement that was signed on May 11th of 2007? A: I believe it was."); 535:3-5 ("Q: And were you present on the 17th when they signed this [the two-page agreement]? A: Yes.").) Strong's testimony also implies that, for some reason, the Millers signed copies of the Short Form, Mine Strip, and Five County Agreements twice–once on May 11 and once on May 17. Moreover, the two-page agreement is dated May 17, 2007 next to the Millers' signatures, making the May 11 signing date extremely unlikely. (Ex. 1 at p. 331.) And Strong testified that he received the two-page agreement "before the 14th," but the two-page agreement appears to have a file-stamp signifying its creation date reading "May 15." (Tr. at p. 556:3; Ex. 1 at p. 330.) Third, Strong testified that he discussed the sixty-ninety day termination window during the May 17 meeting, but two witnesses contradict this testimony. (*Id*. at pp. 539:7-11 (testimony of Allen Strong); 594:18-20 (testimony of Kristen Bauer); 628:2-5 (testimony of Angela Miller).) Numerous witnesses also testified that Strong and Ingersoll discussed a "one-year trial basis" contract during one or more of the May meetings. (*Id*. at pp. 404:7-10 (testimony of Lisa Reed); 420:16-19 (testimony of Brooks Morrow); 436:6-9 (testimony of Paul Fogle); 594:13-17 (testimony of Kristen Bauer); 627:13-19 (testimony of Angela Miller); 718:18-25 (testimony of Duncan Miller).) Fourth, Strong's explanation for the deficiency of the one-page agreement (thereby requiring the Millers to sign the two-page agreement a week later) is not credible. Strong testified that the one-page agreement was deficient because it did not include the $500 employee initiation fee. (*Id*. at p. 559:8-10.) However, while the two-page agreement does include the initiation fee, it includes an additional seven paragraphs absent from the one-page agreement. (Ex. 1 at p. 330-31; Ex. 22.) These paragraphs not

---

[11] If Strong's diary notation is off by one-week–an understandable error involving mistaking one Thursday or Friday for another–then Strong's testimony about presenting the one-page Organizing Agreement one week earlier than the two-page Organizing Agreement is contradictory.

only add to the one-page agreement (incorporating, for example, provisions of the Master Agreement), but they also change the default termination provision from "terminating" to "renewing." It is unlikely that a change motivated by only the $500 initiation fee would have occasioned all the non-initiation-fee related modifications. Accordingly, the court assigns no weight to Strong's version of events surrounding the signing of the agreements.

The court concludes that Mach 4's remaining witnesses provided credible testimony. Local 3 impeached Kristen Bauer effectively with respect to her testimony that Mach 4 employees expressed "strong opposition to the Union." (Tr. at pp. 609-10 ("Q: [Y]ou testified that at that meeting at least a couple of employees expressed what may be characterized as strong opposition to the Union. . . . A: Accurate."); 614:1-4 ("Q: Would you agree with me that it appears from that document that [a strongly opposed employee] on May 14th agreed to become a member of Local 3 and to pay the initiation fee in full? A: Yes.").) Local 3 also effectively impeached Angela Miller with respect to her recollection of the May 17 meeting attendees. (*Id*. at p. 689:6-25 (contrasting Angela's deposition testimony with her trial testimony).) Angela also departed from her deposition testimony in claiming that she did not, in fact, understand how the Master Agreement was related to the Short Form Agreement. (*Id*. at pp. 672-73.) Apart from these contradictions, however, Angela and Bauer's testimony was consistent with the testimony of other Mach 4 witnesses. Notably, Angela and Duncan Miller have continually maintained that their agreement with the union was a one-year agreement, and this understanding was confirmed by their testimony at trial. (Angela's Dep., p. 21:12-14 ("I was under the belief that I didn't have to do anything further. May 1st of 2008, we'd be released if we were not happy."); Duncan's Dep., p. 19:9-12 ("I was under the assumption that the contract would expire within a year from the date that we signed it.").)

**IV.    Findings of Fact**[12]

Having considered the evidence presented at trial, the credibility of the witnesses, and the

---

[12] To the extent any of the findings of fact should more properly be considered conclusions of law, they shall be deemed as such.

legal arguments presented by counsel, the court now makes the following findings of fact pursuant to Fed. R. Civ. P. 52(a). The court relies primarily on the testimony and exhibits cited in this Opinion, although uncited cumulative documentary evidence appearing in the record and considered by the court also supports these findings.

1. The Parties

    a.    Plaintiffs Trustees are the chairman and co-chairman of five trust funds. The trust funds provide pension, health and welfare, retiree health and welfare, vacation savings, training, and other benefits to eligible participants. The five trust funds are the following:

        (1)    the Northern Nevada Operating Engineers Health and Welfare Trust Fund;

        (2)    the Operating Engineers and Participating Employers Preapprentice, Apprentice, and Journeyman Affirmative Action Training Fund for Northern Nevada;

        (3)    the Operating Engineers Pension Fund;

        (4)    the Operating Engineers Vacation and Holiday Pay Plan; and

        (5)    the Pensioned Operating Engineers Health and Welfare Trust Fund.

    b.    Counterclaim plaintiff Local 3 is the Operating Engineers Local Union No. 3, a union representing members in the state of Nevada.

    c.    Defendant and counterclaim defendant Mach 4 is Mach 4 Construction, LLC, a Nevada corporation maintaining offices and conducting business in the District of Nevada.

        (1)    Mach 4 is primarily engaged in construction, excavation, reclamation, and other construction-related work. (Tr. at p. 622:8-11 (testimony of Angela Miller).)

        (2)    Angela and Duncan Miller, a married couple, are the owners of Mach 4.

The Millers formed Mach 4 in March 2007. (Tr. at pp. 622:1-7 (testimony of Angela Miller); 715:15-18 (testimony of Duncan Miller).)

(3)    The Millers are both high-school graduates without further formal education. (Tr. at pp. 640:8-21 (testimony of Angela Miller); 715-16 (testimony of Duncan Miller).)

(4)    Angela and Duncan Miller each have over ten years experience in the construction industry. (Tr. at pp. 655-56 (testimony of Angela Miller); 728:18-19 (testimony of Duncan Miller).)

(5)    Duncan had been a member of Local 3 during his time as an equipment operator. (Tr. at 726:5-18 (testimony of Duncan Miller).)

(6)    In their previous experience, the Millers had entered into one job-specific contract with Local 3. (Tr. at p. 729:2-6 (testimony of Duncan Miller).)

2.  Mach 4's Agreements with Local 3

a.    Allen Strong, an organizer for Local 3, approached the Millers about an agreement with Local 3 sometime in April 2007. (Tr. at pp. 624-25 (testimony of Angela Miller).)

b.    The Millers were receptive to unionization because Mach 4 was in need of qualified equipment operators, and they believed Local 3's hiring hall could provide these equipment operators. (Tr. at p. 631:6-10 (testimony of Angela Miller).)

c.    Mach 4's discussions with Local 3 occurred throughout early May. (Tr. at pp. 393-94 (testimony of Lisa Reed).)

d.    Strong and Local 3's District Representative for Northern Nevada, Steve Ingersoll, discussed a one-year agreement with Mach 4 during one or more of the May meetings. (Tr. at pp. 404:7-10 (testimony of Lisa Reed); 420:16-19 (testimony of Brooks Morrow); 436:6-9 (testimony of Paul Fogle); 594:13-17

(testimony of Kristen Bauer); 627:13-19 (testimony of Angela Miller); 718:18-25 (testimony of Duncan Miller).)

e.  On May 17, 2007, Strong and Ingersoll attended a meeting at the Mach 4 premises. (Tr. at pp. 395-97 (testimony of Lisa Reed); 420:1-6 (testimony of Brooks Morrow); 593:19-22 (testimony of Kristen Bauer).)

f.  The purpose of this meeting was for the Millers to sign, on Mach 4's behalf, a collective bargaining agreement with Local 3. (Tr. at pp. 394-95 (testimony of Lisa Reed).)

g.  At this meeting, Ingersoll–a high-level Local 3 official who also happens to be a trustee on two of the Trustees' trust funds–represented that he had the authority to arrange a one-year contract between Mach 4 and Local 3. (Tr. at p. 397:3-11 (testimony of Lisa Reed).)

h.  Mach 4 signed the signature pages of the following agreements at the May 17 meeting:

   (1)  the Independent Northern Nevada Construction Agreement–the "Short Form Agreement" (Ex. 1);

   (2)  the Northern Nevada Mining and Stripping Agreement (Ex. 13);

   (3)  the Northern Five Counties Agreement (Ex. 14); and

   (4)  the two-page Organizing Agreement (Ex. 1, p. 330-31).

i.  Each agreement was backdated to May 1, 2001 at Angela's request in order to provide health insurance retroactively to Mach 4 employees. (Tr. at p. 595:1-5 (testimony of Kristen Bauer).)

j.  These agreements were not signed by the appropriate union representatives prior to the Millers' signing, nor were they signed by the union during the May 17 meeting. (Tr. at pp. 416-17 (testimony of Lisa Reed).)

k.  Though the Millers signed the two-page Organizing Agreement at the May 17

18

meeting, they immediately rejected and withdrew their agreement to the document principally because of its termination provision. Angela Miller demanded a new Organizing Agreement that more firmly set forth the one-year contract term. (Tr. at p. 627:13-19. (testimony of Angela Miller).)

l.   Strong agreed to return after the meeting with an Organizing Agreement reflecting Angela's desired termination provision, and he brought back a one-page Organizing Agreement several hours later. (Tr. at pp. 627:22-23; 629-30; 752-53 (testimony of Angela and Duncan Miller).)

m.   The Millers agreed to and signed the one-page Organizing Agreement at that time, and Strong left Mach 4's premises with the one-page Organizing Agreement. (Tr. at pp. 629-30 (testimony of Angela Miller); 752-53 (testimony of Duncan Miller).)

n.   In June 2007, the Millers received copies of the Short Form Agreement, the Mine Strip Agreement, the Five Counties Agreement, and the two-page Organizing Agreement that had been signed by union representatives. (Tr. at p. 697:13-24 (testimony of Angela Miller).)

o.   Local 3 did not inform the Millers, and the Millers did not notice, that the previously rejected two-page Organizing Agreement, rather than the one-page Organizing Agreement, had been executed by union officials. (Tr. at p. 630:8-12 (testimony of Angela Miller).)

p.   The Millers never received a copy of the one-page Organizing Agreement signed by union officials. (Tr. at p. 629:18-24 (testimony of Angela Miller).)

3.   The Agreements

a.   The Master Agreement is an agreement between Local 3 and a multi-employer group, the Associated General Contractors of America. (Ex. 2.)

(1)   Mach 4 is not a member of the Associated General Contractors of

19

America. (Ex. 1 at p. 330.)

    (2)    The Master Agreement sets out wage scales, working conditions, and fringe benefit contributions, among other things, applicable to employers. (Ex. 2 at §§ 01.00.00; 06.00.00; 12.00.00.)

    (3)    The Master Agreement also sets out aggregate yearly wage-rate increases, which may be allocated to wages or fringe benefits as the union chooses. (Ex. 2, §§ 01.03.00; 01.05.03; Tr. at p. 395:5-8 (testimony of Steve Ingersoll).)

    (4)    The Master Agreement contains a termination provision reading "This Agreement shall be effective July 1, 2003, and shall remain in effect through June 30, 2008," provided, however, that the Master Agreement continues unless written notice is given by the terminating party. (Ex. 2 at § 26.03.00.)

b.    The Short Form Agreement is an agreement an employer signs when it is not represented by the Associated General Contractors of America with respect to the Master Agreement. (Tr. at p. 285:23-24 (testimony of Steve Ingersoll).)

    (1)    The Short Form Agreement incorporates most terms of the Master Agreement, including the fringe benefit contributions and the yearly wage-rate increases. (Ex. 1 at p. 328, § 2.)

    (2)    The Short Form Agreement excludes the termination provision of the Master Agreement. (Ex. 1 at p. 328, § 2.)

    (3)    Instead, the Short Form Agreement contains its own termination provision, stating as follows: "in the event either party desires to terminate this Agreement, they may do so during the period of sixty (60) to ninety (90) days prior to the expiration of any Master agreement." (Ex. 1 at p. 328, § 5.)

20

c.  The Mine Strip Agreement covers "mine stripping, mine site preparation or road building." (Ex. 13, § 02.02.00.)

    (1)  The Mine Strip Agreement sets out wage rates and fringe benefit contributions specific to the work covered by the Mine Strip Agreement. (Ex. 13, § 04.00.00; 08.00.00.)

    (2)  The Mine Strip Agreement's termination provision states in relevant part: "This Agreement shall be effective January 1, 2007, and shall remain in effect through December 31, 2007 and if the written notice provided by Section 8(d) of the National Labor Relations Act as amended is not given by either the Union or the Employer to the other, it shall continue indefinitely; provided, however, this Agreement may be terminated at any time after_____,____ by either the Union or the Employer . . . ." (Ex. 13, § 16.01.00 (blanks in original).)

d.  The Five County Agreement covers "private work that is performed in Humboldt, Elko, Eureka, Lander and White Pine Counties, Nevada, that is not subject to a prevailing wage law." (Ex. 14, p. 1.)

    (1)  The Five County Agreement includes its own wage and fringe benefit contribution rates. (Ex. 14, p. 3.)

    (2)  The Five County Agreement specifies a termination date of June 30, 2009, renewing automatically in the absence of written notice of termination. (Ex. 14, p. 1.)

e.  The two-page Organizing Agreement "establishes the terms and conditions upon which the Employer shall become signatory." (Ex. 1 at p. 330.)

    (1)  The two-page Organizing Agreement does the following:

        (a)  incorporates terms and conditions of the Master Agreement with limited exceptions (Ex. 1 at p. 330);

21

      (b)     allows the employer six months to assemble "its own crew" (Ex. 1 at p. 330);

      (c)     provides a $500 "Union initiation fee for the current Employees" (Ex. 1 at p. 330); and

      (d)     sets a term of one year that automatically renews in the absence of written notice of termination "not less than sixty (60) nor more than ninety (90) days before the expiration of any . . . Master Agreement." (Ex. 1 at p. 331.)

   f.    Like the two-page agreement, the one-page Organizing Agreement "establishes the terms and conditions upon which the Employer shall become signatory." (Ex. 22.)

     (1)    The one-page Organizing Agreement does the following:

      (a)     allows the employer six months to assemble "its own crew" (Ex. 1 at p. 330); and

      (b)     provides "[t]his agreement shall become effective May 1, 2007, and shall remain in effect until May 1, 2008."

4.   Mach 4's Relationship with Local 3

   a.    Following the signing of the agreements, the Millers were unhappy with the quality of equipment operators being dispatched by Local 3's hiring hall. (Tr. at p. 631:11-21 (testimony of Angela Miller).)

   b.    These concerns caused the Millers to convene a meeting in December 2007 with union representatives, including Ingersoll. (Tr. at pp. 384:18-22 (testimony of Robert Wines, the Millers' attorney); 633:4-16 (testimony of Angela Miller).)

   c.    At this meeting, the Millers' discussed terminating their agreements with Local 3. (Tr. at pp. 634:5-9 (testimony of Angela Miller); 724-25 (testimony of Duncan Miller).)

22

d.    The meeting ended inconclusively, and the Millers did not have their concerns resolved. (Tr. at p. 635:4-9 (testimony of Angela Miller).)

5.  Mach 4's Attempts to Terminate the Agreements

a.    Angela Miller informed Ingersoll over the telephone in late May 2008 that Mach 4 would not be re-signing with the union. (Tr. at p. 573:11-21 (testimony of Steve Ingersoll).)

b.    Ingersoll responded that Angela had to put this information "in writing." (Tr. at pp. 573:18-21 (testimony of Steve Ingersoll); 635:13-18 (testimony of Angela Miller).)

c.    Angela sent a letter to Ingersoll dated June 2, 2008 in which she wrote, "As of May 1, 2008, all of our contracts with the Union are terminated. . . . We do not wish to re[-]sign." (Ex. 501.)

d.    Ingersoll responded that Mach 4 was "out of the timelines to request such termination," meaning the sixty-ninety day window prior to the expiration of the Master Agreement. (Ex. 502.)

e.    On June 13, 2008, the Millers replied that "our last binding contract with you will be expired on June 30, 2008," referring to the Master Agreement's June 30 expiration date. (Ex. 503; Tr. at p. 694:9-18 (testimony of Angela Miller).)

f.    The final correspondence between Local 3 and Mach 4 took place in the form of a letter from Local 3's "Associate House Counsel" Jolsna M. John, in which John told the Millers that "the notice of termination period under your contract ran from April 2, 2008—May 2, 2008." (Ex. 504.)

g.    Therefore, John concluded, the Millers' June 2 termination letter was untimely and ineffective. (Ex. 504.)

6.  Mach 4's Contributions to the Trust Funds

a.    During the period May 1, 2007 to June 30, 2008, the Millers made all or nearly

23

all the required fringe benefit contributions. (Tr. at pp. 605:10-19 (testimony of Kristen Bauer); 637:16-19 (testimony of Angela Miller); 328:1:14 (testimony of Steve Ingersoll); 179:2-6 (testimony of Trustees' witness Alex Miller); Ex. 12, pp. 161-327 (employer contribution reports from May 2007 to June 2008).)

b.     The amount of the Millers' missing contributions during this period was "not unusual." (Tr. at p. 179:2-6 (testimony of Alex Miller).)

c.     Mach 4's employees continued to receive benefits under the collective bargaining agreement through June 30, 2008. (*See* Tr. at p. 605:10-19 (testimony of Kristen Bauer).)

d.     Mach 4 stopped paying fringe benefit contributions beginning July 1, 2008. (Tr. at pp. 605:10-19 (testimony of Kristen Bauer); 637:16-19 (testimony of Angela Miller); 328:1:14 (testimony of Steve Ingersoll); Ex. 12, pp. 133-61 (employer contribution reports beginning July 2008).)

e.     Alex Miller's audit correctly sets out the principal amount of Mach 4's underreported fringe benefit contributions from May 1, 2007 to June 30, 2008. (Ex. 4 at pp. 3-5; 51-52; 85-86.)

f.     The audit incorrectly sets out the liquidated damages and interest calculations. (Tr. at p. 105:6-16.)

g.     The Master Agreement provides for liquidated damages for delinquent contributions in the amount of $35 or 12% of the principal owed, whichever is greater. (Ex. 2 at p. 103, § 12.12.00.)

h.     The Master Agreement provides that a contribution becomes delinquent on the 25th of the month following the month for which the contributions are due. (Ex. 2 at p. 96, § 12.01.00)

i.     The Master Agreement provides interest on delinquent contributions (including liquidated damages) at a rate of 12% per year. (Ex. 2 at p. 103, § 12.12.00.)

24

j.      The Master Agreement's liquidated damages and interest provisions are applicable to the Mine Strip and Five County Agreements. (Ex. 13 at p. 4, §08.01.00; Ex. 14.)

k.      Mach 4's delinquent contributions from May 1, 2007 to June 30, 2008 total $7,547.16.[13] (Ex. 4 at pp. 3-5; 51-52; 85-86.)

## V.      Conclusions of Law[14]

Mach 4 and Local 3's collective bargaining agreement lasted for a period of one year and two months. Therefore, to the extent Trustees' and Local 3's claims depend on a contract period longer than this, these claims fail.

### A.  Local 3's Claims[15]

Local 3 makes two arguments in support of its breach claims (which depend on a contract period longer than one year and two months): first, Mach 4 is bound by the "clear language" of the collective bargaining agreement, which includes the automatic-renewal provision of the two-page Organizing Agreement. Of course, this argument begs the question of whether Mach 4 accepted the two-page agreement. Therefore, Local 3 argues, second, that the Millers' signatures on the two-page agreement operated as acceptance, and "a party who signs a written agreement generally is bound to its terms, even though he may not consider the legal consequences of signing it." *Operating Engineers Pension Trust v. Gilliam*, 737 F.2d 1501, 1504 (9th Cir. 1984).

In light of the circumstances which followed the Millers' signing of the two-page agreement, the court finds that the Millers rejected this proposed agreement and withdrew any offer which may have arisen from it. Therefore, Local 3's attempt to bind the Millers to the two-page

---

[13] This amount includes a deduction for a $192 overpayment in 2007. (Ex. 4 at p. 1.)

[14] To the extent any of the conclusions of law should more properly be considered findings of fact, they shall be deemed as such.

[15] The court's jurisdiction over the contract dispute between Local 3 and Mach 4 is appropriate under 29 U.S.C. § 185.

agreement fails. Instead, the Millers signed and only agreed to the one-page Organizing Agreement, limiting the contract period to one year–May 1, 2007 through May 1, 2008. The Millers' subsequent contributions through June 2008 only evidenced an intent to be bound by the collective bargaining agreement until they terminated this agreement on June 30, 2008. All agreements terminated on June 30, 2008.

### 1.    Collective Bargaining Agreement Formation between Mach 4 and Local 3

Collective bargaining between a union and an employer may arise in two ways. Under section 9(a) of the National Labor Relations Act ("NLRA"), 29 U.S.C. §§ 151-69, a majority of employees may designate a collective bargaining representative with whom the employer must deal. 29 U.S.C. § 159. Alternatively, under section 8(f) of the NLRA, building and construction industry employers may negotiate with a union before the employees have designated it as their collective bargaining representative. 29 U.S.C. § 158(f). Agreements reached under section 8(f) are commonly called "pre-hire" agreements, and they are unique to the building and construction industry. *Mesa Verde Const. Co. v. N. California Dist. Council of Laborers*, 861 F.2d 1124, 1127 (9th Cir. 1988) (en banc). Because these two types of agreements have different attributes–the first a compelled negotiation, the second a voluntary one–they import different rules of formation.

For example, with respect to section 9(a) agreements, courts have often observed that "[t]echnical rules of contract law do not control whether an agreement between the parties has been reached." *Ivaldi v. N.L.R.B.*, 48 F.3d 444, 448 (9th Cir. 1995). *See also Auciello Iron Works, Inc. v. N.L.R.B.*, 517 U.S. 781, 784 n.2 (1996) ("The [National Labor Relations Board] has developed a number of criteria to assess whether a collective-bargaining contract has been formed . . . which may not always coincide with those that would govern in the general area of contract law.") As the Eighth Circuit explained, the section 9(a) context justifies this deviation from the "technical rules of contract" because the "National Labor Relations Act compels the employer and the duly certified union to deal with each other and to bargain in good faith"–a compulsory negotiation unlike the

voluntary negotiations that are the domain of contract law.[16] *Pepsi-Cola Bottling Co. of Mason City, Iowa v. N.L.R.B.*, 659 F.2d 87, 89 (8th Cir. 1981). Thus, under section 9(a), "the technical question of whether a contract was accepted in the traditional sense is perhaps less vital than it otherwise would be[; r]ather, a more crucial inquiry is whether the two sides have reached an 'agreement,' even though that 'agreement' might fall short of the technical requirements of an accepted contract." *N.L.R.B. v. Donkin's Inn, Inc.*, 532 F.2d 138, 141 (9th Cir. 1976). Whether the parties have reached an agreement is a factual determination. *Ivaldi*, 48 F.3d at 448.

Under section 8(f), however, departures from the standard principles of contract formation are less justified. These agreements resemble voluntary requirements contracts for a supply of labor–agreements firmly within the domain of contract law. "Obligations under a [section 8(f)] collective bargaining agreement, like those under contracts in general, rest ultimately on the principle of mutual assent." *Gilliam*, 737 F.2d at 1503-04. Indeed, the legislative history behind section 8(f) supports treating pre-hire agreements more like private contracts than like section 9(a) agreements. In approving section 8(f), Congress accommodated the preexisting practice of the building and construction industry. *Mesa Verde*, 861 F.2d at 1131. Employers in this industry must know their labor costs before making an estimate upon which their bids will be based, and construction employers must have an available supply of "skilled craftsmen ready for quick referral."[17] *Id*. By voluntarily recognizing a union, an employer satisfies both needs. And courts

---

[16] As some courts have explained, compelled negotiations make section 9(a) collective bargaining agreements more similar to treaties between warring parties–capital and labor, in the parlance of the NLRA's time–than to private commercial contracts. *Yazoo & M. V. R. Co. v. Webb*, 64 F.2d 902, 903 (5th Cir. 1933).

[17] Indeed, Mach 4 exemplifies the latter need. (Tr. at p. 631:6-10 (testimony of Angela Miller).) There is another theme running through many of the cases addressing the formation of collective bargaining agreements under section 8(f): the construction-industry employer is frequently legally unsophisticated. In *Gilliam*, for example, the owner-operator employer signed a slew of agreements believing them to be union membership documents. 737 F.2d at 1503. Instead, the agreements were collective bargaining agreements. *Id. See also McNally Pittsburg, Inc. v. Int'l Ass'n of Bridge, Structural & Ornamental Iron Workers, AFL-CIO*, 812 F.2d 615, 617 (10th Cir. 1987) (describing an

1   have emphasized that section 8(f) agreements do not entrain the same duties to collectively bargain

2   as section 9(a) agreements. *Id.* at 1132-34. Departures from the normal strictures of the law of

3   contract formation are therefore unwarranted in the pre-hire context.

4          Under these normal strictures, an offerree's acceptance of an offer is generally measured by

5   "the objective manifestation of intent." *Caporale v. Mar Les, Inc.*, 656 F.2d 242, 244 (7th Cir.

6   1981) (discussing acceptance in the collective bargaining context). However, when the offerree's

7   "objective manifestations of intent" are ambiguous or unclear, "an inquiry into . . . the other

8   circumstances surrounding the outward manifestation is appropriate." 2 *Williston on Contracts* §

9   6:4 (4th ed.) (citing *Caporale*).

10         Here, Mach 4 entered a section 8(f) agreement with Local 3. The credible evidence

11  establishes both that the Millers signed the two-page Organizing Agreement and that the Millers

12  contemporaneously objected to the agreement's automatic-renewal clause. (Tr. at p. 627:13-19

13  (testimony of Angela Miller); Ex. 22.) Therefore, the court turns to "the surrounding circumstances

14  and the intentions of the parties . . . to determin[e] if a binding agreement exists." *Gilliam*, 737 F.2d

15  at 1504 (collecting cases).

16         In light of these circumstances and intentions, the Millers rejected Local 3's offer of an

17  automatically renewing collective bargaining agreement as embodied in the two-page Organizing

18  Agreement. First, in the course of preliminary negotiations with Local 3, Mach 4 repeatedly

19  insisted on a "one-year trial period." (Tr. at pp. 404:7-10 (testimony of Lisa Reed); 420:16-19

20  (testimony of Brooks Morrow); 436:6-9 (testimony of Paul Fogle); 594:13-17 (testimony of Kristen

21  Bauer); 627:13-19 (testimony of Angela Miller); 718:18-25 (testimony of Duncan Miller).) Second,

22  at the May 17 meeting, Ingersoll–Local 3's District Representative **and trustee of two of the trust**

23  ─────────────────────────

24  employer who inadvertently signed a collective bargaining agreement believing it to be a "stabilization
    agreement"). While the unsophisticated sign contracts at their own peril, the requirement of mutual

25  assent may defeat the union's attempt to enforce such contracts. *Gilliam*, 737 F.2d at 1503-04; *McNally
    Pittsburg*, 812 F.2d at 621. *See also* 2 *Williston on Contracts* § 6:60 (4th ed.) (grounding the refusal

26  to enforce such contracts on the principle of mutual assent).

**funds at issue here**–asserted that he had the authority to offer a one-year contract. (*Id*. at p. 397:3-11 (testimony of Lisa Reed).) Third, Local 3 accommodated the Millers' objection to the automatic-renewal provision by drafting and furnishing the one-page agreement, which did not contain an automatic-renewal provision.[18] (*Id*. at pp. 627:22-23; 629-30; 752-53 (testimony of Angela and Duncan Miller).) Fourth, in their June 2008 letter, the Millers wrote that they did "not wish to re[-]sign." (Ex. 501; *see also* Tr. at p. 522:6-7 (Duncan Miller's March 2008 comment to Allen Strong).) Under the automatic renewal provision of the two-page Organizing Agreement, re-signing would be unnecessary. Fifth, in that same June 2008 letter, the Millers asserted that "[a]s of May 1, 2008 all of our contracts with the Union are terminated." (Ex. 501.) Thus, the circumstances surrounding the signing and attempted termination of the agreements with Local 3 indicate that the Millers were acting under a reasonable understanding that the one page Organizing Agreement was the operative agreement.

The evidence further establishes that the one-page Organizing Agreement was the operative agreement with Local 3. First, neither Trustees nor Local 3 has provided any reason to doubt that the Millers' signatures on this agreement act as the "objective manifestation" of their assent to its terms. In contrast to the circumstances surrounding the execution of the two-page agreement and its rejection by the Millers before it was signed by Local 3's representatives, no credible evidence has been offered that contradicts this interpretation. Second, neither Trustees nor Local 3 has argued that Strong and Ingersoll were without authority to offer the one-page agreement. Indeed, Ingersoll testified at trial that he obtained the authority to offer a one-year contract, and he affirmed this authority at the May 17 meeting. (Tr. at pp. 567:1-7(testimony of Steve Ingersoll); 397:3-11 (testimony of Lisa Reed).) Third, neither Trustees nor Local 3 has disputed that the one-page agreement drafted by Local 3 was an offer capable of creating an enforceable contract upon

---

[18] The two-page agreement did provide for a one-year term, but it automatically renewed this term. (Ex. 1 at p. 331.) The one-page agreement may therefore be interpreted as the two-page agreement minus the offending renewal provision.

1  acceptance by Mach 4.

2      Local 3's representatives were clearly aware that the Millers had rejected the two page

3  agreement and that the Millers were relying upon the one page agreement. Local 3 had drafted the

4  one page agreement only after the Millers had rejected the two page agreement. When the parties

5  carried on in the year which followed, the one page agreement was clearly the operative agreement.

6  This conclusion holds despite the lack of union officials' signatures on the one-page agreement. *See*

7  *Brown v. C. Volante Corp.*, 194 F.3d 351, 355 (2d Cir.1999) (finding that, as long as a collective

8  bargaining agreement is written and addresses the pertinent terms, it need not be signed to be

9  effective). In contrast, the presence of union officials' signatures on the two-page agreement has no

10  legal effect because that proposed agreement had been rejected and withdrawn by Mach 4 prior to

11  its execution by the union officials.

12      To the extent the Millers' conduct indicates an intent to be bound by certain terms of the

13  collective bargaining agreement following the one-year term until June 30, 2008, this conduct is

14  sufficient to bind them through that period. "[G]eneral principles of contract law permit an

15  employer to adopt a collective bargaining agreement by a course of conduct plus a writing such as

16  the certification line on the contribution report." *Moriarty v. Larry G. Lewis Funeral Directors*

17  *Ltd.*, 150 F.3d 773, 777 (7th Cir. 1998). *See also Laborers' Pension Fund v. Blackmore Sewer*

18  *Const., Inc.*, 298 F.3d 600, 606 (7th Cir. 2002). The undisputed evidence shows, first, that Mach 4

19  made the contractually required fringe benefit contributions through June 2008. Second, after the

20  Millers' first attempt at termination met resistance from Local 3, the Millers wrote that "[their] last

21  binding contract with [Local 3] will be expired on June 30, 2008," in clear reference to the

22  expiration date of the Master Agreement. (Ex. 503). Third, Mach 4 has presented no evidence that

23  it or its employees turned down union benefits prior to June 30, 2008. Therefore, Mach 4's conduct

24  manifested an intent to be bound by the collective bargaining agreement following May 1, 2008,

25  and until June 30, 2008.

26  ///

Importantly, though, this conduct did not signal Mach 4's acceptance of or agreement to the collective bargaining agreement's sixty-ninety day written termination provisions. First, Mach 4's behavior is most reasonably interpreted as extending the period of the agreement ending May 1. Since this agreement avoided the sixty-ninety day termination provisions as embodied in the various agreements (see below), the extended contractual term avoided these provisions as well. Second, Mach 4 repeatedly manifested its intention to end its relationship with Local 3 at the end of a non-renewing contract period. (Exs. 501, 503.) Third, Mach 4's continued contributions were spurred in large part by Local 3's false assertion that Mach 4's termination efforts were unsuccessful. (Ex. 502.) Fourth, "general principles of contract law" (as relied on by the *Moriarty* court, for example) provide that contracts for an indefinite period usually terminate upon reasonable notice. 1 *Williston on Contracts*, *supra*, § 4:22. Since Mach 4's course-of-conduct contract with Local 3 had no fixed duration, it ended according to the reasonable terms of Mach 4's June 13 letter. (Ex. 503.) Fifth, Mach 4 did, in fact, cease payments on July 1, 2008. (Ex. 12, pp. 133-61 (employer contribution reports beginning July 2008).) Thus, Mach 4's conduct after May 1, 2008 was sufficient to bind it to the collective bargaining agreement's fringe benefit contribution requirements, but it also evidenced a clear intent not to be bound by the sixty-ninety day termination provisions.

### 2.    The Termination Provision

The court reads the one-page agreement together with the other agreements. *Cent. States, Se. & Sw. Areas Pension Fund v. Kroger Co.*, 73 F.3d 727, 731 (7th Cir. 1996) (noting that, in the collective bargaining context, there is "no reason why we should depart from the basic rule that related documents must be read together"). The conclusion of such a reading is that the May 1, 2008 termination date set out in the one-page Organizing Agreement is the termination date for all of the written agreements signed by Mach 4.

First, the one-page agreement asserts that "[t]his Organizing Agreement establishes the terms and conditions upon which the Employer shall become signatory." (Ex. 22.) The term

"signatory" is ambiguous because it leaves out a necessary complement specifying the agreement or agreements to which "the Employer shall become signatory." (In other words, signatory to what?) Therefore, the court may consider extrinsic evidence in interpreting this term according to the parties' intent. *Operating Engineers Pension Trusts v. B & E Backhoe, Inc.*, 911 F.2d 1347, 1352 (9th Cir. 1990).

Steve Ingersoll testified that "[u]sually an Organizing Agreement is put in place if there's provisions that the employers are requesting that aren't in the [Short Form] Agreement or one of the other agreements." (Tr. at p. 285:7-10.) Accordingly, since the Millers requested a distinct termination date that was not a part of any agreement, the one-page Organizing Agreement modified the termination provisions of the "other agreements" (Short Form, Mine Strip, and Five County Agreements) to conform with the termination provision of the one-page Organizing Agreement.

Other evidence supports this interpretation. For example, the Five County Agreement specifies a termination date (with automatic renewal) of June 30, 2009, and the one-page agreement does not address the Five County Agreement specifically. However, the two-page Organizing Agreement states, "The Employer agrees to comply with the terms and conditions of the Master Agreement for Northern Nevada and the Private Work Agreement, with the following exceptions, amendments, and modifications . . ." (Ex. 1 at p. 330.) (The "Private Work Agreement" denominated here is the Five County Agreement. (Ex. 14.)) Since the intent of replacing the two-page agreement with the one-page agreement was to reform the two-page agreement's terminating provision (and nothing else); since the one-page agreement is otherwise functionally identical to the two-page agreement; since the parties' conduct is consistent with non-termination-related provisions of the two-page agreement that are absent from the one-page agreement (in particular, the payment of the $500 initiation fee (*see, e.g.*, Ex. 25)); and since neither Local 3 nor Trustees has argued that the Five County Agreement has an independent termination date, the parties likely intended the one-page Organizing Agreement to modify the termination date of the Five County

1    Agreement.

2       Similarly, the one-page Organizing Agreement modified the termination provision of the

3 Short Form Agreement. In the short version of this conclusion, Organizing Agreements are

4 generally intended to modify Short Form Agreements with employer-requested provisions. (Tr. at

5 p. 285:7-10 (testimony of Steve Ingersoll).) In the long version, the "exceptions" provision of the

6 two-page Organizing Agreement addressed the Master Agreement. (Ex. 1 at p. 330 ("The Employer

7 agrees to comply with the terms and conditions of the Master Agreement . . . with the following

8 exceptions, amendments, and modifications . . ." ).) Since the exceptions provision carries into the

9 one-page Organizing Agreement as discussed above, the one-page Organizing Agreement modifies

10 the terms of the Master Agreement. In particular, the one-page agreement provides a May 1, 2008

11 non-renewing termination date to any provisions of the Master Agreement to which Mach 4 may be

12 bound. Since the Short Form Agreement is the mechanism by which Mach 4 is bound to provisions

13 of the Master Agreement, the Short Form Agreement does not bind Mach 4 to anything after May

14 1, 2008. (Ex. 1 at p. 328, § 2.) Interpreting the collective bargaining agreement "in such a way that

15 no language is rendered superfluous," the court must conclude that the one-page Organizing

16 Agreement also modifies the termination provision of the Short Form Agreement. *See Aeronautical*

17 *Indus. Dist. Lodge 91 of Int'l Ass'n of Machinists & Aerospace Workers, AFL-CIO v. United*

18 *Technologies Corp., Pratt & Whitney*, 230 F.3d 569, 576 (2d Cir. 2000).

19       Finally, while neither the two-page nor the one-page Organizing Agreement addresses the

20 Mine Strip Agreement, the parties left the termination date blank in the executed version of that

21 agreement. (Ex. 13 at p. 7.) A reasonable inference from this omission is that the parties intended

22 the Organizing Agreement to supply the Mine Strip Agreement's termination provision.

23 Accordingly, Mach 4's written collective bargaining agreement with Local 3 ended May 1, 2008.

24       **3.**     **Statutory Notice and Waiting Period**

25       Section 8(d) of the NLRA requires a party seeking to modify or terminate a collective

26 bargaining agreement to provide sixty days written notice. 29 U.S.C. § 158(d)(1). This section also

provides that the collective bargaining agreement "continues in full force and effect . . . all the terms and conditions of the existing contract for a period of sixty days after such notice is given." 29 U.S.C. 158(d)(4). These provisions go hand-in-hand with the overall scheme of compelling negotiations between the employer and the union. *Nat'l Labor Relations Bd. v. Lion Oil Co.*, 352 U.S. 282, 292, 77 S. Ct. 330, 336, 1 L. Ed. 2d 331 (1957) (noting that section 8(d)(4) is "no more than a means for preventing 'quickie' strikes by requiring a 'cooling-off' period which would not in any circumstances exceed 60 days.")

However, the full force of section 8(d) does not apply to pre-hire agreements under section 8(f). *Mesa Verde*, 861 F.2d at 1132 ("By its terms, section 8(f) does not confer full 9(a) status on a union."). And in particular, the 8(d)(1) notice requirement does not apply to agreements reached under section 8(f). This conclusion requires some statutory hop-scotch: first, in *John Deklewa & Sons*, 282 NLRB 1375 (1987) (endorsed explicitly in *Mesa Verde*), the NLRB concluded that "the obligations [imposed] on an 8(f) employer through [the] application of Section 8(a)(5) to 8(f) agreements are limited to prohibiting the unilateral repudiation of the agreement until it expires or until that employer's unit employees vote to reject or change their representative." Section 8(a)(5), in turn, prevents an employer from "refus[ing] to bargain collectively with the representatives of his employees." And the duty to bargain collectively is defined, in part, by the notice requirements of section 8(d). 29 U.S.C. 158(d) ("[T]he duty to bargain collectively shall also mean that no party to such contract shall terminate or modify such contract, unless the party desiring such termination or modification [complies with the notice requirements]."). Therefore, the only obligation applicable to a section 8(f) employer under section 8(d)–defining the duty to bargain collectively–is the prohibition on unilateral repudiation before the expiration of the contract period. Notably, this obligation does not incorporate the sixty-day notice period.

This result also comports with the purposes behind section 8(f). In passing section 8(f), "Congress . . . recognized that the [construction] industry had special needs." *Mesa Verde*, 861 F.2d at 1130. In particular, the "occasional nature of the employment relationship" in building and

34

construction ("[a]n individual employee typically works for many employers and for none of them continuously") renders the compelled renegotiation of pre-hire agreements inappropriate. In addition (and as noted above), section 8(f) agreements are similar to voluntary requirements contracts for a supply of labor. Aside from *Deklewa*'s prohibition against unilateral repudiation, the NLRA leaves parties to section 8(f) agreements free to order aspects of their relationship–including the termination of that relationship. Therefore, Mach 4 was not required by statute to provide sixty days written notice in order to terminate its agreements with Local 3.

### B.  Trustees' Claims

Mach 4 was obligated under 29 U.S.C. § 1145 to contribute to the trust funds for the duration of the contract period. This section provides, "Every employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of such plan or such agreement." The terms and conditions of Mach 4's collective bargaining agreement ceased to bind Mach 4 after June 30, 2008, and therefore Mach 4's obligation to make further contributions ended.

### 1.    Delinquent Contributions

Trustees argue that defects in contract formation do not alter Mach 4's obligation to contribute to the trust funds after June 30, 2008. In *MacKillop v. Lowe's Mkt., Inc.*, 58 F.3d 1441 (9th Cir. 1995), the Ninth Circuit confronted a section 1145 action in which the employer claimed that the collective bargaining agreement was void because the union failed to meet the "uncoerced majority requirement of the labor laws." (This meant that not enough employees had selected the union as their bargaining representative.) Due to the union's failure, the employer argued that it was free from the obligation of making contributions to the ERISA plans. *MacKillop*, 58 F.3d at 1443.

The court began by noting that "[i]n recognition of the fact that millions of workers depend upon employee benefit trust funds for their retirement security, Congress and the courts have acted to simplify trust fund collection actions by restricting the availability of contract defenses, which

make collection actions unnecessarily cumbersome and costly." *Id*. (quoting *Southwest Administrators, Inc. v. Rozay's Transfer*, 791 F.2d 769, 773 (9th Cir.1986)). It then repeated *Rozay's Transfer*'s rule: only contract defenses which make an agreement void, rather than voidable, are available to the employer in actions under 29 U.S.C. § 1145. *Id*. The union's failure to attain majority status made the collective bargaining agreement voidable, rather than void, and the employer remained obligated to make the necessary contributions. *Id*. at 1144.

     *MacKillop* does not support Trustees' position. First, *MacKillop* recognized that "for an employer to be obligated to make employee benefit contributions to a trust fund, there must exist a binding collective bargaining agreement." *Id*. at 1446 (quoting *Rozay's Transfer*). Here, the court has determined that the collective bargaining agreement ceased to bind the parties on June 30, 2008. Without a binding agreement after this date, Mach 4 had no obligation "to make employee benefit contributions to a trust fund." Second, *MacKillop* addressed affirmative contract defenses like fraud in the execution, *id*., but such defenses are not at issue here. Rather, in a collection action under section 1145, Trustees "must show there was a collective bargaining agreement between [Mach 4] and [Local 3]." *Firesheets v. A.G. Bldg. Specialists, Inc.*, 134 F.3d 729, 730 (5th Cir. 1998). Trustees have failed to make this showing for the period following June 30, 2008. Trustees object that they are not required "to litigate the termination dispute between [the employer] and the Union," *Carpenters Health & Welfare Trust Fund v. Bla-Delco Constr., Inc.*, 8 F.3d 1365, 1369 (9th Cir. 1993), but the objection is unfounded: in this consolidated action, Local 3 (unsuccessfully) litigated its own termination dispute. Accordingly, *MacKillop* is consistent with limiting Mach 4's obligated contributions to the trust funds to the period from May 1, 2007 to June 30, 2008.

     Trustees also argue that Mach 4's submission of contribution reports bound it to a longer term of obligated contributions. The contribution reports included language that "the employer . . . agrees to be bound by all of the terms of the Union's Collective Bargaining Agreement(s) which covers the type and kind of work the employer performs and which establishes the fringe benefit contribution rates set forth herein." (*See, e.g.*, Ex. 12 at p. 137.) However, courts have viewed

contribution-report language like this as just one piece of evidence probative of the formation of a collective bargaining agreement. *Moriarty*, 150 F.3d at 777. As discussed above, the full picture of Mach 4's conduct is one demonstrating an intent to be bound until no later than June 30, 2008.

### 2. Awards under Section 1132(g)(2) of ERISA and the Millers' Personal Guaranties

Though Mach 4's delinquent contributions during the contract period were "not unusual," they were still delinquent, and Mach 4 has not disputed the delinquent amount. (Tr. at p. 179:2-6 (testimony of Alex Miller).) Under 29 U.S.C. § 1332(g)(2), Trustees are owed the principal, interest, and liquidated damages as provided by the agreements for all delinquent contributions. In particular, Trustees are owed interest as provided in the agreements and "an amount equal to the greater of" liquidated damages or interest. 29 U.S.C. § 1132(g)(2)(C).

Here, the undisputed evidence establishes that Mach 4 owed delinquent contributions in the principal amount of $7,547.16 through June 30, 2008. (Ex. 4 at pp. 3-5; 51-52; 85-86.) The evidence also establishes that the interest rate for delinquent contributions under the collective bargaining agreement is 12% per year. (Ex. 2 at p. 103, § 12.12.00.) Finally, the evidence establishes that liquidated damages under the collective bargaining agreement are 12% of the delinquent amount or $35, whichever is higher.[19] (*Id*.) Therefore, Trustees are owed $7,547.16 at 12% interest per year from the date of delinquency. In addition, since the amount of interest on the principal is greater than the amount of liquidated damages, Trustees are owed 12% interest per year on the principal from the date of delinquency in lieu of liquidated damages.

Trustees may also recover reasonable attorney's fees and "other legal or equitable relief" in an action for delinquent contributions. 29 U.S.C. § 1132(g)(2); *see also Operating Engineers*

---

[19] Trustees imply that the liquidated damages provision includes 12% of the principal *and* interest on that amount at 12% per year. The court disagrees. Indeed, under this reading, the contract does not provide a rate of interest for delinquent contributions (the rate is, instead, part of the liquidated damages). But this reading contradicts the Trustees' own determination of the contractual interest rate.

*Pension Trust v. A-C Co.*, 859 F.2d 1336, 1342 (9th Cir. 1988) (holding that an award of attorney's fees is mandatory "when there is a judgment in favor of an employment benefit trust'). "Other legal or equitable relief" may include audit costs. *A-C Co.*, 859 F.2d at 1342.

Finally, Trustees claim that the Millers are personally liable for any delinquent contributions under a guaranty clause in the Short Form Agreement. (Ex. 1 at p. 328, §1(11).) The Millers do not dispute the applicability of this clause.

**VI.   Conclusion**

Mach 4 entered into a collective bargaining agreement with Local 3 from May 1, 2007 to June 30, 2008. This agreement did not invoke, either by its terms or through statutory provision, a written notice requirement prior to termination. Since Mach 4's obligations to contribute fringe benefit payments to Trustees were coterminous with the agreement, these obligations also ended on June 30, 2008.

IT IS THEREFORE ORDERED that judgment be entered in favor of Trustees on their first and fourth claims for delinquent fringe benefit contributions and for the personal liability of the Millers, respectively. Trustees are hereby awarded $7,547.16 in delinquent contributions, plus interest at 12% per year, plus interest at 12% per year in lieu of liquidated damages. Trustees are also awarded reasonable audit and attorney's fees to be determined upon post-verdict application.

IT IS FURTHER ORDERED that judgment be entered in favor of Mach 4 and the Millers on Trustees' second and third claims for a compelled audit and for the compelled filing of contribution reports.

IT IS FURTHER ORDERED that judgment be entered in favor of Mach 4 on Local 3's counterclaims for breach of contract and declaratory judgment.

IT IS SO ORDERED.

DATED this 22nd of March, 2013.

_____
LARRY R. HICKS
UNITED STATES DISTRICT JUDGE